UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LATASHA LOPER o/b/o P.L., | ) | CASE NO. 1:17CV1849 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES S. GWIN |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Defendant. | ) | |
| | ) | |

LaTasha Loper ("Plaintiff"), acting on behalf of P.L. ("Claimant"), her minor daughter, seeks judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying Claimant's application for Supplemental Security Income ("SSI"). ECF Dkt. #1. In her amended brief on the merits, filed on April 9, 2018, Plaintiff asserts that the administrative law judge ("ALJ") erred in finding that Claimant did not have a severe medical impairment and erred by attributing great weight to the opinion of a medical expert ("ME") who did not have the highly material evidence that was submitted after the ALJ hearing. ECF Dkt. #17. Plaintiff further asserts that the speech and language evaluation that she submitted after the ALJ hearing constitutes new and material evidence warranting a remand. *Id.* On May 2, 2018, Defendant filed a brief on the merits. ECF Dkt. #18. Plaintiff did not file a reply brief.

For the following reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and dismiss the instant case in its entirety with prejudice.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for SSI on behalf of Claimant in October of 2014, alleging a disability onset date of January 11, 2014, Claimant's date of birth. ECF Dkt. #10 ("Tr.") at 186.[2]

---

[1]On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed as a .PDF, rather that the page numbers assigned by the CM/ECF system. When the Transcript was filed the

Plaintiff alleged that Claimant was disabled due to muscle stiffness and developmental delay.  *Id.* at 141.  The claim was denied initially and upon reconsideration.  *Id.* at 57-73.  Following the denial of the claim, Plaintiff requested a hearing.  *Id.* at 95.  Accordingly, a hearing was held on May 10, 2016, with the ALJ, the ME and Plaintiff's counsel initially.  *Id.* at 20-59.  Plaintiff arrived late to the hearing and did not bring Claimant although instructed to do so.  *Id.* at 27-28. The ALJ heard testimony from a ME and Plaintiff, with counsel present.  *Id.* at 20-59.

On May 17, 2016, Plaintiff filed a letter to the ALJ indicating that she no longer wanted her counsel's representation.  Tr. at 126.  She indicated that she was presenting Claimant's medical records and "[a]ny further records she has not been scheduled to present at this time. Therefore I am asking for a decision to be made based on these new medical records I gave today or dismiss until more exams are scheduled."  *Id.*  On May 18, 2016, counsel advised the agency that he and his office no longer represented Claimant and Plaintiff.  *Id.* at 127.

On August 17, 2016, the ALJ issued a decision denying Plaintiff's claim.  Tr. at 10-15.

On October 18, 2016, Plaintiff wrote a letter to the SSA stating that she had additional medical papers to present for the case and indicating that she was asked to sign a form that she did not understand.  Tr. at 51.  She requested more time to present medical evidence.  *Id.*

On October 24, 2016, the SSA wrote Plaintiff a letter indicating that she could provide more evidence, but it must be new and material to the issues considered at the hearing.  Tr. at 49.

The record contains a letter dated May 23, 2017 from the SSA to Senator Rob Portman of the United States Senate noting that they acknowledged his inquiry into Claimant's case for Plaintiff and they were in the process of responding.  Tr. at 54.  The SSA also indicated that the Appeals Council had received Plaintiff's request for review of the ALJ's decision, Senator Portman's inquiry, and additional material he had submitted to the record.  *Id.*  It appears that Claimant's November 2, 2016 medical records were included with the inquiry.  *Id.* at 55-56.

---

.PDF included an index, with the indexed pages differentiated from the numerical pages.  Accordingly, the page number assigned in the .PDF mirrors the page number printed on each page of the Transcript, rather than the page number assigned when the Transcript was filed in the CM/ECF system.

The record contains a July 14, 2017 letter from the SSA to Senator Portman advising him that the Appeals Council had begun its evaluation of the case. Tr. at 53. On the same day, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. *Id.* at 1-4. The ALJ's decision therefore stands as the final decision.

On September 1, 2017, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. She wrote a letter stating that Claimant was entitled to SSI because her symptoms matched those of a child with ataxia as she had imprecise motor skills, trouble walking and balancing, and she operated mentally at 15-20 months behind her peers according to the November 2016 expert evaluation. *Id*. at 2-3. She asked for "professional review" because the ALJ lacked "any information" and he granted a continuance for more evidence that was not considered or looked at by him. *Id*. at 3. She requested punitive damages in the amount of $2,000,000.00 for "mental anguish and physical suffering." *Id*.

On November 27, 2017, Plaintiff filed a motion requesting the appointment of counsel. ECF Dkt. #11. She indicated that she had attempted to secure counsel but was unsuccessful in doing so. *Id.* The undersigned's office spoke with Attorney Margolius upon the filing of this motion to see if she would consult with Plaintiff about the case. Attorney Margolius graciously agreed to do so and reported that she spoke to Plaintiff and set up three appointments to meet with her about the case, but Plaintiff canceled all three appointments. The undersigned thereafter denied Plaintiff's motion for the appointment of counsel on January 26, 2018. ECF Dkt. #12.

On February 27, 2018, the undersigned issued an Order to Show Cause, informing Plaintiff that she needed to show cause on or before March 13, 2018 why the undersigned should not recommend dismissal of the complaint for her failure to file a brief on the merits that was due by December 14, 2017 and not filed. ECF Dkt. #13. Thereafter, on March 1, 2018, Attorney Margolius filed a notice of appearance in the case and requested an extension of time within which to file a brief on the merits. ECF Dkt. #s 14, 15. The undersigned granted the motion.

On April 3, 2018, Plaintiff, through counsel, filed a brief on the merits. ECF Dkt. #16. On April 9, 2018, Plaintiff, through counsel, filed an amended brief on the merits. ECF Dkt.

#17. Defendant filed a brief on the merits on May 2, 2018. ECF Dkt. #18. Plaintiff did not file a reply brief.

## II.   STEPS TO DETERMINE WHETHER CHILD IS ENTITLED TO SSI

In order to qualify for childhood SSI benefits, a claimant must show that he or she has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and that is expected to cause death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.906. An ALJ must proceed through the required sequential steps for evaluating entitlement to childhood SSI. 20 C.F.R. § 416.924(a). The three-step procedure requires the ALJ to determine whether a child:

> (1) is performing substantial gainful activity;
>
> (2) has a "severe" impairment or combination of impairments; and
>
> (3) whether the impairment or combination of impairments are of listing-level severity in that the impairment(s) either meets, medically equals or are the functional equivalent in severity to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing").

20 C.F.R. § 416.924(a)-(d). In order to *meet* a Listing, the child's impairment(s) must be substantiated by medical findings shown or described in the listing for that particular impairment. 20 C.F.R. § 416.925(d) (emphasis added). In order to *medically equal* a Listing, a child's impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that particular impairment. 20 C.F.R. § 416.926(a) (emphasis added.) In order to *functionally equal* a Listing, the child's impairment(s) must be of listing-level severity; *i.e.*, it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a) (emphasis added.)

## III.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).

-4-

Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).   Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *Id.*; *Walters,* 127 F.3d at 532.  Substantiality is based upon the record taken as a whole.  *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

**IV.**    **RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE**

    **A.**    **Medical Evidence**

Medical records show that Claimant was born on January 11, 2014 in an uncomplicated birth.  ECF Dkt. #10 ("Tr.") at 193.  Claimant's physical examination was normal.  *Id.*

On May 30, 2014, Plaintiff presented Claimant, who was nineteen weeks old, to the emergency room for fever and vomiting.  Tr. at 185. Examination showed that Claimant was active, well-hydrated, well-appearing, alert and interactive.  *Id.* at 186.  Her physical examination was normal as she moved all four extremities, had a normal heart rate and clear breath sounds, and was neurologically intact.  *Id.*  Oral thrush and nasal congestion were noted. *Id.*  She was diagnosed with an upper respiratory infection and oral thrush and prescribed medication. *Id.*

On July 18, 2014, Plaintiff presented Claimant, who was six months old, to Dr. Kiefer, a pediatrician.  ECF Dkt. #10 ("Tr.") at 178, 229.   Plaintiff reported to Dr. Kiefer that a prior doctor told her that Claimant may have cerebral palsy and she had been worried and upset ever since. *Id.* at 178, 230.  Plaintiff asked if Dr. Kiefer would order a number of tests for Claimant, including a MRI.  *Id.*  Dr. Kiefer advised that Plaintiff should not jump to conclusions about cerebral palsy because many factors for such a diagnosis do not manifest until an infant is older.

*Id*.  He also told her that such a diagnosis cannot be made until a thorough examination was performed by a pediatric neurologist.  *Id*.

Dr. Kiefer examined Claimant and found that she had no skin lesions, normal head circumference, normal eye appearance, normal ear, nose and throat examination, no neck stiffness or abnormal range of motion,  normal breath sounds, normal heart sounds, normal abdominal exam, normal spine curvature, normal extremities, and normal neuromuscular examination, except for some mild stiffness in her muscle tone.  Tr. at 180. Dr. Kiefer assessed Claimant with normal growth, developmental delay, and increased muscle tone.  *Id*. He indicated that he made a referral to the appropriate consultant.  *Id*. at 178.

Plaintiff presented Claimant, who was nine months old, to Dr. Kiefer on October 17, 2014, and reported that she felt that Claimant was developmentally different from her siblings and her balance was not the same as theirs.  Tr. at 170-171, 235.  Dr. Keifer again noted Plaintiff's concern about Claimant having cerebral palsy and Plaintiff again asked for a MRI for Claimant.  *Id*.  Dr. Keifer again advised Plaintiff not to jump to conclusions and told her that such a diagnosis cannot be made until a thorough examination was performed by a pediatric neurologist.  *Id*.

Dr. Kiefer conducted a physical examination of Claimant, finding dry skin, an alert, content appearance, normal head circumference, normal eye appearance, normal ear, nose and throat examination, but for nasal discharge, no neck stiffness or abnormal range of motion, normal breath sounds, normal heart sounds, normal abdominal exam, normal spine curvature, normal extremities, and normal neuromuscular examination.  Tr. at 173. Dr. Kiefer noted that Plaintiff reported Claimant's previous hospitalization at the Cleveland Clinic, but she could not provide information regarding this stay, she could not remember the tests that the doctors told her to have performed, and she did not bring the relevant paperwork regarding the hospitalization or the tests recommended.  Tr. at 171.  He further noted that he had an extended conversation with Plaintiff and Plaintiff was not satisfied with the conversation.  *Id*.  He particularly noted that Plaintiff was "firmly convinced that 1.  There is something seriously

-6-

wrong with her child, and 2. 'cat scan & mri scans' will be needed to properly diagnose her child's condition; somewhat upset that I will not order these studies today." *Id*. at 172.

Dr. Kiefer assessed that Claimant had normal growth and development. Tr. at 173. He diagnosed a stuffy and runny nose, dry skin and "[v]ulnerable child syndrome." *Id*. He advised Plaintiff to keep the appointment that she had with pediatric neurology on October 22, 2014 and to return to him if necessary at any time. *Id.*

On November 28, 2014, Plaintiff presented Claimant to Dr. Rizkala, a pediatric neurologist, upon referral from Dr. Kiefer, for muscle stiffness. Tr. at 241. He documented Plaintiff's report that Claimant was not developing normally and was different from her siblings, although Plaintiff could not describe how. *Id*. Plaintiff explained to him that when she was living in Washington, D.C., she took Claimant to the doctor because Claimant was having seizures because as she kept moving her head up and kept looking up. *Id.* She stated that Claimant had a dent in the back of her head since birth and could not move her head when she was born. *Id*. at 244. The doctor in Washington checked Claimant's newborn screen and told Plaintiff it was normal. *Id*. at 241. Plaintiff reported that the doctor then referred her to a children's hospital and another doctor told her that Claimant needed to be evaluated by a neurologist because she may have cerebral palsy. *Id*. Plaintiff reported that they then moved to Cleveland and when Claimant was admitted to the hospital for dehydration, Plaintiff asked for a brain MRI of Claimant but was refused because it was not part of her initial complaint. *Id.* Plaintiff further indicated that she then went back to the Cleveland Clinic and saw a doctor who told her that she needed to videotape the seizures that she was concerned about and bring it in to him. *Id*. Plaintiff reported that Dr. Keifer then evaluated Claimant and diagnosed her with stiff muscles and referred her to a neurologist. *Id*. Plaintiff reported to Dr. Rizkala that the looking up episodes had improved but were still present, Claimant sat up well, pulled to stand up, recognized her name, crawled, waved goodbye, said "mama," clapped her hands, played "peek a boo," and ate Cheerios with her fingers. *Id*.

Dr. Rizkala documented that Plaintiff became tearful and stated that Claimant could not control her head, foamed at the mouth, could not be put in a swing or walker because she could

not control her head, and Plaintiff could not leave Claimant with anyone because she could not tell them what was wrong with Claimant. Tr. at 244. Plaintiff told Dr. Rizkala that she thought that Claimant was "retarded" and asked him, "What is wrong with my child? Just tell me so I can face it!" *Id.*

Dr. Rizkala further noted that Plaintiff had requested the neurology referral while Claimant was in the hospital for dehydration as he was the senior resident on the team that decided a neurology referral was not necessary. Tr. at 244. He noted that when Plaintiff presented for the current visit, she told the nurse that she was promised in the hospital that Claimant would be referred to neurology, which Dr. Rizkala noted was not the team's plan upon discharge of Claimant at the hospital. *Id.*

Dr. Rizkala then performed a physical examination of Claimant at the current visit, noting that Claimant was holding a bottle with both hands and showing stranger anxiety, tracking her mom's movements, and she became more interactive at the end of the visit by smiling and babbling. Tr. at 243. His physical examination, including the neurological examination of Claimant, was "completely normal." *Id.* at 245. Dr. Rizkala diagnosed gastroenteritis, resolved and "[w]orried well visit." *Id.* He specifically noted that "Mother's concerns about [P.L's] 'neurological problems' were not verified by my exam today. It was admittedly difficult to get a thorough and linear history from the family. However, none of the events seem out of the range of normal. Conferred with my attending, Dr. Macknin. At present, the description fits with spasmus nutans. HOWEVER, EYE MOVEMENTS PARENTS DESCRIBE AREN'T AS RAPID AS ON THE VIDEO WE VIEWED TOGETHER WITH MOM ON INTERNET. I ENCOURAGED THEM TO VIDEOTAPE EPISODE PRIOR TO VISIT TO PEDIATRIC NEUROLOGY." *Id.* (emphasis in original). Dr. Rizkala referred Claimant to pediatric neurology "based on parental report of a previous provider's promise and continued parental concern." *Id.*

Dr. Rizkala further noted that he spent more than 50% of the visit time informing Plaintiff that Claimant had a normal neurological exam and normal development, and Plaintiff asked how the doctor could know without a brain MRI of Claimant. Tr. at 245. Dr. Rizkala

documented that when he told Plaintiff that no indication was warranted for a brain MRI and a brain MRI at Claimant's age involved risks and sedation which could lead to breathing complications and even death, Plaintiff repeated that Claimant needed a brain MRI because she was concerned about cerebral palsy. *Id*. He further noted that he told Plaintiff that he uses his professional judgment to make a diagnosis of cerebral palsy and the tests that are needed to be ordered or not ordered, but Plaintiff could get a second opinion. *Id.* Dr. Rizkala indicated that Plaintiff left his office upset and raising her voice to tell the nurse that she needs to see another doctor "because this man is telling me that my daughter does not have CP without ordering a brain MRI." *Id*.

On December 26, 2014, Plaintiff presented Claimant, who was 11 months old, to Certified Nurse Practitioner ("CNP") Nash for a well child visit. Tr. at 208. Plaintiff reported that Claimant was having black out episodes and nose bleeds. *Id*. at 209. Plaintiff stated that she believed that Claimant had a neurological problem in her brain and she wanted Claimant checked, even though she had already been to neurology and was not happy with the assessment there. *Id*. Plaintiff indicated that Claimant was eating well, but she could not yet walk or balance on her own. *Id*. CNP noted that Claimant was holding on to Plaintiff's arm and seemed slightly unstable in her gait. *Id*. He advised Plaintiff to go to the emergency room due to her reports of Claimant having black out episodes. *Id*. He examined Claimant and found reported normal results, including a normal neuromuscular exam. *Id*. at 211. He assessed normal growth and development, but also developmental delay and black outs. *Id*. at 209.

On April 15, 2015, Plaintiff was referred to the Ohio Department of Health's Help Me Grow program based upon her doctor's concerns over Claimant's muscle stiffness, balance and coordination. Tr. at 257. It was determined that Claimant was eligible for services based upon a developmental delay in her gross motor skills. *Id*. at 258. Plaintiff reported that Claimant had no complications at birth, but she would be receiving occupational, physical and speech therapy. *Id*. at 261. Plaintiff also reported that Claimant had nose bleeds at night and was in need of further testing to determine if she had cerebral palsy. *Id.* Evaluation showed no delays in adaptive, cognitive, physical, communication or social/emotional skills. *Id*. at 267. However, it

-9-

was determined that Claimant was eligible for services due to delays in gross motor skills to help her learn to walk with a steadier gait based upon observations, pediatrician statements, the clinical judgment of the evaluator, and information provided by the family.  *Id.*

Claimant was referred to a pediatric neurologist by Dr. Gacad, a primary care doctor, on April 15, 2016.  Tr. at 268.  It was noted that Plaintiff reported a global delay by Claimant in smiling, walking and talking, and that a primary care physician or neurologist had diagnosed a developmental delay or possible cerebral palsy.  *Id.*  The primary care physician also indicated that Claimant had torticollis that resolved and muscle stiffness that was improving.  *Id.*  She was assessed as having delayed developmental milestones and esotropia.  *Id.*

On April 20, 2015, Dr. Waldron, a neurologist, evaluated Claimant, and noted that Claimant was already seen for evaluation of paroxysmal events concerning seizures and hypertonia and Dr. Gacad had recommended testing, including a MRI, and referral to neurology. Tr. at 270.  Dr. Waldron noted that Plaintiff reported that Claimant still had cortical fisting and stiffness with walking, but she was no longer concerned with seizures.  *Id.*  Plaintiff also reported that Dr. Gacad had agreed that Claimant needed a MRI and Dr. Gacad was concerned about hypertonia and global developmental delay.  *Id.*  Physical examination revealed normal results, including a normal gait, except for a finding of mild diffuse hypertonia with occasional fisting of the right hand, although Claimant could open it completely.  *Id.* at 271-272.  Dr. Waldron diagnosed hypertonia and developmental delay and referred Claimant to ophthalmology based upon Plaintiff's concern for esotropia, which was not seen upon Dr. Waldron's exam.  *Id.* at 272.          Dr. Waldron noted that Claimant was improving in her development and her hypertonia was resolving.  Tr. at 273.  She opined that Claimant did not meet the criteria for cerebral palsy, and her neurological examination improved, although therapies should be continued.  *Id.* She ordered a MRI of the brain without contrast but with sedation as she opined that while Claimant was outgrowing the hypertonia, she was still at risk for other developmental challenges.  *Id.*

On November 13, 2015, Plaintiff referred Claimant to the Ohio Department of Health's Help Me Grow program based upon Plaintiff's concerns over Claimant's mental, physical and

-10-

speech development.  Tr. at 250.  It was determined that Claimant was demonstrating skills and behaviors similar to those her age, so she was not eligible for Early Intervention under the program.  *Id*. at 251.  Plaintiff had reported that Claimant had a stroke at birth, had been diagnosed with ataxia, had developmental delays, muscle stiffness, and possibly cerebral palsy.  *Id*. at 254.  Plaintiff reported that Claimant was being followed by a neurologist and had testing, but not a MRI.  *Id.*  She also reported that Claimant walked on her tip toes, kept her hands half-fisted, she was off balance, and she lacked attention to and awareness of her surroundings.  *Id*.  The evaluation of Claimant for the program showed no delays in adaptive, cognitive, communication, physical or social/emotional skills.  *Id.* at 256.

On January 25, 2016, Plaintiff was diagnosed by an unidentified provider with developmental and speech delays, and esotropia.  Tr. at 284.  She was referred to the neurology department.  *Id*.

On March 22, 2016, Plaintiff presented Claimant, who was 26 months old, to physical therapy for an evaluation, upon doctor referral.  Tr. at 214.  Physical Therapist ("PT") Redman noted that Plaintiff reported that Claimant walked on her toes, was off balance, did not talk, and several doctors and therapists told her that Claimant presented with neurological damage and she should look up ataxic cerebral palsy.  *Id*.  PT Redman noted that Claimant was evaluated at Metrohealth by pediatric neurology in 2014 and was assessed with normal growth and development, and normal neurologic findings.  *Id*.

Upon evaluation, PT Redman noted that Claimant was alert, active, attentive to toys, smiling and cooperative.  Tr. at 214.  She noted that Claimant responded to two-step commands, could put two words together in sentences, and her motor, hearing, vision and tactile skills were normal.  *Id*. at 215.  PT Redman reported that Claimant presented with asymmetries, strength deficits, balance deficits and gait abnormality.  *Id.* at 217.  The gross motor performance test showed that Plaintiff performed at the age equivalency of a 37-39 month old child.  *Id.*

When told of the results and PT Redman's professional opinion, Plaintiff disagreed, stating that Claimant was not doing things the same way as her 3 year-old sister and Plaintiff became agitated with the examination findings because she was concerned that Claimant was not

-11-

going to receive the therapy that she believed Claimant needed.  Tr. at 217-218.  PT Redman agreed to a home exercise program, but noted that Plaintiff did not allow time to discuss the program and follow up visits would occur in order to discuss such a program.  *Id.*

Also on March 22, 2016, Plaintiff presented Claimant for an occupational therapy evaluation.  Tr. at 222.  Plaintiff reported that Claimant had seen multiple neurologists and pediatricians.  *Id.*  Occupational Therapist ("OT") Davis conducted an evaluation and noted that Claimant was smiling, alert and cooperative, made eye contact, interacted with her, and would follow one and two level commands and put two words together occasionally.  *Id.* at 223.  OT Davis noted that after she began her evaluation and shared the results of the gross motor evaluation with Plaintiff, Plaintiff became agitated and stopped the evaluation, stating that Claimant was tired and they needed to reschedule.  *Id.* OT Davis reported that she attempted to continue the evaluation, but Plaintiff stopped it again.  *Id.*  OT Davis noted the tasks that Claimant completed and she scored Claimant at 40 from the test that she was able to conduct, which was not complete and therefore not able to be standardized.  *Id.* at 224. However, OT Davis explained that a score of 40 is an age equivalent of 26 months and Claimant presented as having age-appropriate fine motor and self-care skills.  *Id.*  She indicated that Claimant would benefit from an ongoing evaluation of her muscle tone, her passive range of motion, strength, quality of movement, and home program instruction as needed.  *Id.*  She opined that Claimant's prognosis for therapy was "good."  *Id.*

### B.    Hearing Testimony

At the May 10, 2016 hearing before the ALJ, Plaintiff's counsel indicated that she had difficulty contacting her client.  Tr. at 22-24.  Counsel noted that there was very little in the record and she did not believe that the record was complete because Plaintiff told her that she was taking Claimant for further testing.  *Id.* at 24.  Counsel explained that Plaintiff believed that Claimant had cerebral palsy, developmental delays, and balance problems.  *Id.*

The ME then testified.  Tr. at 26-27.  He opined that the record contained no information of any significant impact.  *Id.*

-12-

Plaintiff then arrived.  Tr. at 27-28.  She explained that she did not know that she was supposed to bring Claimant to the hearing.  *Id*.  She testified that Claimant's current pediatrician, Dr. Gacad, ordered Claimant to undergo physical, occupational and speech therapies.  *Id.* at 30. Plaintiff indicated that she was not aware that counsel who was present at the hearing was her counsel as she had been communicating with another person and had previously signed releases for Claimant's medical information.  *Id.* at 31.

The ALJ reiterated that the record was barren and he indicated that it was hard for him to ask questions or to understand the issues that Claimant was having.  Tr. at 32.  He asked Plaintiff to explain Claimant's diagnoses and not just what was suspected.  *Id*.  Plaintiff replied that Claimant was two years old and diagnosed with a global developmental delay.  *Id.*  She further testified that Claimant's pediatrician said that there was neurological damage and she wanted Claimant to have a CT scan of her brain because she believed that Claimant had brain damage, which was causing her coordination to be off and her thought process to not be where it should be.  *Id*.  Plaintiff reported that Claimant was diagnosed with a speech disorder, a global delay and something was wrong with her eyes.  *Id*. at 33.  Plaintiff explained that Claimant was diagnosed with hypertonia at the age of six months, she was still being diagnosed with it, and the last time she saw a neurologist was last year.  *Id*.

The ALJ again stated that little information was in the record, which made it difficult for the ME to form an opinion and for Plaintiff to meet her burden of proving Claimant's disability. Tr. at 38.  Counsel then requested that the ALJ hold the record open for her and Plaintiff to obtain the records that Plaintiff stated were out there.  *Id.*  The ALJ agreed to hold the record open for two weeks to see what could be accomplished and he would hold the record open longer after that if it looked like it would be fruitful to do so.  *Id*. at 39.  The ALJ reminded Plaintiff that she needed to keep in contact with her counsel and to work with her. *Id*. at 39-41.  In response to Plaintiff's inquiry as to whether state agency doctors could examine Claimant, the ALJ explained that the ME had testified that nothing was wrong with Claimant based upon the little information that he had in the record.  *Id*. at 42.  However, the ALJ indicated that if more information was available as Plaintiff stated there was, he may order another hearing with state agency

-13-

examination. *Id.* at 43. He advised Plaintiff to work with the agency and her counsel and to pay attention to notices from the agency and stay in touch with her counsel. *Id.*

## V. SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

After stating the applicable law in his decision, the ALJ indicated that Claimant was under one year of age on the date that the application for SSI was filed. Tr. at 13. The ALJ found that Claimant had not engaged in substantial gainful activity since the application date. *Id.* At Step Two, the ALJ concluded that no medical or laboratory findings substantiated that Claimant had any medically determinable impairments and he therefore determined that Claimant had not been disabled, as defined in the Social Security Act, since October 11, 2014, the date the application was filed. *Id.* at 15. The ALJ indicated in his decision that he afforded great weight to the conclusions of the ME, and although the ME did not consider the post-hearing evidence submitted by Plaintiff of Claimant's examinations with Dr. Rizkala after July 18, 2014, the later evidence established that Claimant had no neurological problems and no issues that were outside the range of normal. *Id.* at 14.

## VI. ANALYSIS

### A. STEP TWO ANALYSIS

#### 1. Medically Determinable Impairment

Plaintiff asserts that the ALJ committed reversible error when he failed to recognize that Claimant's developmental delay met the *de minimus* requirement at Step Two for establishing a severe impairment. ECF Dkt. #17 at 7. Respondent contends that the ALJ did not commit error because the *de minimus* requirement at Step Two is separate from the finding that the ALJ made, which was that Claimant had no medically determinable impairments. ECF Dkt. #18 at 10. Respondent asserts that since the ALJ determined that Claimant had no medically determinable impairments, he did not have to determine whether any medically determinable impairment was severe, which is when the *de minimus* requirement applies. *Id.*

Section 1382c(C)(i) of Title 42 of the United States Code provides that:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which

-14-

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(C)(i).  At step two of the sequential steps for evaluating entitlement to social security benefits for children, the appropriate regulation provides that:

(c) You must have a medically determinable impairment(s) that is severe. If you do not have a medically determinable impairment, or your impairment(s) is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations, we will find that you do not have a severe impairment(s) and are, therefore, not disabled.

20 C.F.R. § 416.924(c).  The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims."  *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985).  The Sixth Circuit has construed the step two severity regulation as a "*de minimis* hurdle" in the disability determination process.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988).  The claimant bears the burden of establishing the existence and severity of her impairments.  *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 545 (6th Cir. 2007).

Plaintiff cites to *Higgs v. Bowen*, 880F.2d 860 (6th Cir. 1998), and asserts that the ALJ erred by heightening the Step Two *de minimus* standard and not discussing Claimant's developmental delay in light of this minimal standard.  ECF Dkt. #17 at 8.  Plaintiff contends that Claimant's impairment meets the *de minimus* hurdle because the record contains numerous references to Claimant's developmental delay and the impact of the delays on her functioning, which was more than slight or minimal.  *Id.* at 8-9.

The undersigned recommends that the Court find that the ALJ did not erroneously apply the *de minimus* hurdle.  The ALJ cited to and quoted from 20 C.F.R. §§ 416.924(c), 416.929(b), and Social Security Ruling ("SSR") 96-4p in determining that no medical signs or laboratory findings substantiated that Claimant had any medically determinable impairments.  Tr. at 13.  He correctly found that these regulations and SSR provide that "[a]n 'impairment' must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  Although the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further

-15-

provide that under no circumstances may the existence of impairments be established on the basis of symptoms alone."  Tr. at 13, citing 20 C.F.R. §§ 416.924(c), 416.929(b), SSR 96-4p. The ALJ found at Step Two that even though the medical records showed some developmental delays, a speech disorder, and hypertonia, these were initial diagnoses, and follow-up visits did not substantiate the existence of a medically determinable impairment.  Tr. at 13-15.  Without a finding of a medically determinable impairment, the ALJ was not required to determine the severity of any impairment, which is when the *de minimus* standard then applies.  Accordingly, the ALJ applied the proper legal standard.

The undersigned also recommends that the Court find that substantial evidence supports the ALJ's decision to find that Claimant had no medically determinable impairments.  Plaintiff points out that there are diagnoses in the record for Claimant of developmental delay, speech disorder, and hypertonia.  The undersigned reiterates that this Court cannot reverse the decision of an ALJ if it is supported by substantial evidence, even if substantial evidence exists in the record that would have supported an opposite conclusion.  *Walters,* 127 F.3d at 528.  Moreover, substantial evidence is more than a scintilla of evidence, but less than a preponderance.  *Richardson*, 402 U.S. at 401.

The ALJ reviewed the evidence of record, beginning with birth records of Claimant indicating a normal newborn status.  Tr. at 197-199.  He cited to records showing that in October of 2014, when Claimant was nine months old, Plaintiff repeated her prior concern to Claimant's pediatrician that something was seriously wrong with Claimant and she wanted further scans to properly diagnose the condition.  *Id.* at 13-14.  The ALJ noted that Dr. Kiefer assessed Claimant with normal growth and development at that time, but referred Claimant to a pediatric neurologist.  *Id*. at 14.  Dr. Kiefer had noted at his six-month examination of Claimant that she had mildly stiff muscle tone.  *Id*. at 232.  He assessed normal growth, developmental delay, and increased muscle tone.  *Id.* However, at the nine-month examination, Dr. Kiefer noted that Plaintiff was not satisfied with his decision to not order any further testing for Claimant based upon his present finding of the normal growth and development of Claimant.  *Id*. at 239.  He noted a diagnosis of vulnerable child syndrome.  *Id.* at 239.

-16-

The ALJ also cited to Dr. Rizkala's November[3] 2014 pediatric neurological examination of Claimant in which he found that she had a normal neurological evaluation and normal development.  Tr. at 14, citing Tr. at 245.  He noted that Dr. Rizkala found that Plaintiff's neurological concerns for Claimant were not verified during the examination.  *Id*.  Dr. Rizkala also noted that Plaintiff left the examination upset as although he spent half of the visit time talking with her about his assessment that Claimant had normal development and a normal neurological evaluation, she requested a brain MRI to determine cerebral palsy and he told her he would not order one based upon his professional judgment.  *Id.*

The ALJ additionally cited to Dr. Waldron's pediatric assessment of Claimant in April of 2015 in which she found that Claimant had conjugated eyes, full range of motion and equal strength and symmetry in her extremities, normal muscle tone and bulk, but mild diffuse hypertonia with occasional fisting in the right hand, although Claimant could open it completely and had a normal gait.  Tr. at 14, citing Tr. at 272.  The ALJ noted that Dr. Waldron found that Claimant was doing well and had improved in her development and her hypertonia was resolving.  Tr. at 14, citing Tr. at 273.  He further noted Dr. Waldron's conclusion that Claimant did not meet the criteria for cerebral palsy, but she should continue speech, occupational and physical therapies, undergo a brain MRI, and be referred to pediatric ophthalmology for concerns regarding esotropia.  *Id.* at 272.  Dr. Waldron's assessment and plan was approved by Dr. Scher, who agreed with Dr. Waldron, but he separately noted that although Claimant was outgrowing hypertonia, she was still at risk for other developmental challenges, so a brain MRI would be useful in assessing her risk given her older age.  *Id*. at 274.

In finding that Claimant had no medically determinable impairments, the ALJ indicated that although a brain MRI was to be scheduled, the records showed no evidence that it was ever performed and Plaintiff testified that it was not performed.  Tr. at 14.  The ALJ also noted that although the record showed that Claimant was beginning to receive speech, occupational and

---

[3]It appears that the ALJ mistakenly cited this examination as performed in October 2014 when the encounter date of this record identifies November 28, 2014 as the examination date.  Tr. at 241.  The findings cited by the ALJ concerning this examination are correct.

physical therapies, Plaintiff testified that Claimant had not yet received any therapy.  *Id*.  Of note, the record shows that on March 22, 2015, Plaintiff presented Claimant for a physical therapy evaluation with PT Redman, who evaluated Claimant and determined that her gross motor function was 2.5 above the mean for her age and at the age equivalency of 37-39 months even though she was 26 months old.  *Id*. at 220.  PT Redman noted that when she presented these findings to Plaintiff, Plaintiff disagreed with the findings and became agitated and concerned that Claimant would not get the therapy that she felt was necessary.  *Id*. at 221.  After discussions with Plaintiff and due to her concerns, PT Redman concluded that Plaintiff would benefit from a home exercise program for some mild asymmetries on the left side, with some decreased balance.  *Id.* at 220-221.

The record also shows that Plaintiff presented Claimant to OT Davis for an occupational therapy evaluation, but Plaintiff discontinued the evaluation before it was over after the results of the gross motor examination were shared with her and she became agitated and stopped the evaluation, stating that Claimant was tired.  Tr. at 226.  The evaluation showed that Claimant was alert, smiling, cooperative, had visual focus, put two words together occasionally, followed one and two-step commands, she turned toward sound, tolerated touch throughout the evaluation, could self-calm, and began to meet most of the Bayley Scale of Infant and Toddler Development, until Plaintiff stopped the evaluation.  *Id*. at 225-227.  OT Davis attempted to continue the evaluation, but Plaintiff again stopped it.  *Id*.  Based upon her limited evaluation, OT Davis found that Claimant presented with age-appropriate fine motor and self-care skills.  *Id*. at 227.  She found that Claimant would benefit from a home exercise program and ongoing evaluation of her muscle tone, range of motion, strength and quality of movement.  *Id*. at 227.  She opined that Claimant's prognosis for therapy was "good."  *Id*.

The ALJ considered the diagnoses by medical providers of developmental delay, speech disorder, and hypertonia.  However, he noted that these same providers found normal growth and development upon clinical examinations and none found limitations.  Tr. at 15.  After reviewing the medical evidence, the ALJ concluded that despite some initial diagnoses, follow-up visits did not substantiate the existence of a medically determinable impairment.  *Id*.  The ALJ also relied

upon the testimony of the ME, giving the testimony great weight, and the opinions of the state agency reviewing physicians, who found that Claimant had no medically determinable impairment that was severe. *Id*. at 14-15, citing Tr. at 26-27, 62, 70. The ME had testified that upon his review of the medical record, "[t]here is no information in this record of any significant impact[4]." *Id.* at 26-27. A state agency physician concluded in January of 2015 that based upon his review of the record, Claimant "has not been diagnosed or treated for any severe medically determinable impairment." *Id.* at 62. A second state agency physician concluded upon reconsideration that Claimant had no medically determinable impairments. *Id*. at 70.

Again, while substantial evidence may exist to the contrary, the standard of review is whether substantial evidence supports the ALJ's determination that Claimant had no medically determinable impairments. *Walters,* 127 F.3d at 528. Based upon the record and the ALJ's review of the record, the undersigned recommends that the Court find that substantial evidence supports the ALJ's determination that Claimant had no medically determinable impairments.

## 2. Harmless Error–No severity

Should the Court find that the ALJ erred in determining that Claimant did not have a medically determinable impairment, the undersigned recommends that the Court find that this error was harmless because Plaintiff does not meet her burden of establishing that Claimant's developmental delay, speech disorder, and hypertonia were severe impairments, another component of Step Two. While this is a *de minimus* hurdle, a review of the medical evidence shows no more than a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.

The ALJ reviewed the medical evidence concerning Claimant's developmental delay, speech disorder, and hypertonia. Tr. at 13-15. He noted Plaintiff's deep concerns about Claimant's development, but he pointed out that the medical providers who diagnosed Claimant with developmental delay, speech disorder, and hypertonia did not set forth any limitations

---

[4] The undersigned notes that the ALJ indicated that the ME testified that "there is no information in the record of any significant **impairment** (Testimony)." Tr. at 14. However, the transcript of the ME's testimony indicates that he stated that "[t]here is no information in the record of any significant **impact**." *Id*. at 27 (emphasis added).

resulting from these diagnoses and they found normal growth and development upon clinical examinations.  *Id.*  The Sixth Circuit has noted that "[w]hen doctors' reports contain no information regarding physical limitations or the intensity, frequency, and duration of pain associated with a condition, this court has regularly found substantial evidence to support a finding of no severe impairment." *Despins v. Comm'r of Soc. Sec.*, No. 07-1385, 257 Fed. Appx 923, 2007 WL 4462369, at **6 (6th Cir. Dec. 14, 2007), unpublished, citing *Long v. Apfel*, 1 Fed.Appx. 326, 331 (6th Cir.2001) (citing *Higgs v. Bowen*, 880 F.2d 860 (6th Cir.1988); *Maloney v. Apfel*, No. 99–3081, 2000 WL 420700 (6th Cir. Apr. 14, 2000); *Foster v. Sec'y of Health & Human Servs.*, No. 88–1644, 1990 WL 41835 (6th Cir. Apr. 11, 1990)).  The ALJ in the instant case also noted the ME's testimony that the information in the medical record in Claimant's case showed no significant impairment or impact.  *Id.* at 26-27.  Accordingly, the undersigned recommends that even if the Court finds that the ALJ erred in determining that Claimant had no medically determinable impairments, this error constitutes harmless error because the same evidence that the ALJ cited to and already reviewed constitutes substantial evidence for a finding that Claimant's conditions were not severe.

     **B.**      **MEDICAL EXPERT**

     Plaintiff further asserts that the ALJ erred in affording great weight to the opinion of the ME because the ME did not have the opportunity to review the evidence that Plaintiff submitted after the ALJ hearing.  ECF Dkt. #17.  The undersigned again notes that the ALJ stated that the ME testified that "there is no information in the record of any significant **impairment** (Testimony)"  while the transcript of the ME's testimony indicates that he stated that "[t]here is no information in the record of any significant **impact.**"  Tr. at 14, 27 (emphasis added).  Nevertheless, the ALJ afforded great weight to the ME's testimony and found that the post-hearing evidence submitted by Plaintiff failed to establish a medically determinable impairment.  *Id*. at 14.  The post-hearing evidence is outlined above in the Medical Evidence section and consisted of Claimant's December 26, 2014 visit to CNP Nash for a well-child visit in which Plaintiff stated that Claimant experienced black-outs and nose bleeds.  *Id.* at 208-209.  Plaintiff explained that she thought that Claimant had a neurological problem and wanted her to be

checked out, even though she had been to a neurologist and was not happy with the assessment. *Id*. at 209.  CNP Nash advised Plaintiff to take Claimant to the emergency room for these concerns.  *Id.*  He noted that Claimant was holding on to Plaintiff and seemed unsteady in her gait.  *Id*.  However, he conducted a physical examination of Claimant and found no abnormalities.  *Id.* at 209-211.  He assessed that Claimant had normal growth and development, although he listed diagnoses of well child check, development delay, routine child check and black-out (not amnesia).  *Id*. at 209-211.

Post-hearing records also included the March 22, 2016 PT assessment of Claimant by PT Redman, in which she found some mild asymmetries and gait abnormality and recommended a home exercise program, although Claimant's gross motor skills showed an age equivalency of 37-39 months when her actual age was 26 months.  Tr. at 216-217.  PT Redman noted Plaintiff's disagreement with these findings and her agitation.  *Id*. at 218.  The OT assessment conducted the same day was also included in the post-hearing records which showed that OT Davis began conducting an evaluation, but Plaintiff stopped the evaluation and would not continue.  *Id*. at 221-224.  OT Davis noted that Claimant presented with age-appropriate fine motor and self-care skills based upon her brief evaluation, but Claimant would benefit from a home program and an ongoing evaluation of muscle tone, range of motion, strength and quality of movement.  *Id.* at 224.  She opined that Claimant's prognosis for therapy was good.  *Id.*

Post-hearing records further included Dr. Kiefer's July 18, 2014 and October 17, 2014 examinations of Claimant in which he diagnosed muscle stiffness, developmental delay and vulnerable child syndrome on October 17, 2014, but found normal growth and development upon physical examination.  Tr. at 235-240.  Dr. Rizkala's November 28, 2014 examination of Claimant was also included, in which Plaintiff expressed her concerns about Claimant's neurological development and Dr. Rizkala noted that Plaintiff's concerns were not verified upon his examination of Claimant, which included nothing out of the range of normal.  *Id*. at 245. The Ohio Help Me Grow records were also included, which found that early intervention services were needed on April 17, 2015 because Claimant had delays in gross motor skills, but such

-21-

services were not needed on November 13, 2015, because no delays were found and Claimant was demonstrating skills similar to others her age. *Id*. at 256, 267.

The post-hearing evidence also included Dr. Gacad's April 15, 2015 referral of Claimant to pediatric neurology for "evaluation and treatment of global developmental delay." Tr. at 268. The ALJ also considered Dr. Waldron's pediatric assessment of Claimant in April of 2015 in which she found that Claimant had conjugated eyes, full range of motion and equal strength and symmetry in her extremities, normal muscle tone and bulk, but mild diffuse hypertonia with occasional fisting in the right hand, although Claimant could open it completely and had a normal gait. Tr. at 14, citing Tr. at 272. The ALJ noted that Dr. Waldron found that Claimant was doing well and had improved in her development and her hypertonia was resolving. Tr. at 14, citing Tr. at 273. He further noted Dr. Waldron's conclusion that Claimant did not meet the criteria for cerebral palsy, but she should continue speech, occupational and physical therapies, undergo a brain MRI, and be referred to pediatric ophthalmology for concerns regarding esotropia. *Id*. at 272. Dr. Waldron's assessment and plan was approved by Dr. Scher, who agreed with Dr. Waldron, but he separately noted that although Claimant was outgrowing hypertonia, she was still at risk for other developmental challenges, so a brain MRI would be useful in assessing her risk given her older age. *Id*. at 274.

While the ME did not consider this post-hearing evidence, the ALJ explained that this evidence did not reveal any medically determinable impairments and therefore did not change the great weight that he afforded to the ME's opinion. Tr. at 14. The ALJ reviewed the post-hearing medical evidence, which for the most part, showed findings of normal growth and development with a few mild clinical findings at most. *Id.* He specifically cited the note by pediatric neurologist Dr. Rizkala which indicated that Claimant had normal development and neurologic examination, Plaintiff's concerns about Claimant's neurologic problems were not verified during his examination of Claimant, and the events that Plaintiff was describing about Claimant were not out of the range of normal. *Id.* The ALJ has the discretion in determining whether to call a ME or order a consultative examination. *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908, 911 (N.D. Ohio 2008)(citations omitted). Here, the post-hearing evidence was

-22-

not insufficient, it did not conflict with other medical evidence in the record, and it was not inconsistent with the other medical evidence finding normal examinations and growth and development. Therefore, the undersigned recommends that the Court find that the ALJ was not required to recontact medical sources, including the ME.

## VII.    NEW AND MATERIAL EVIDENCE

Plaintiff asserts that a November 2, 2016 speech-language evaluation that she submitted concerning Claimant to the Appeals Council constitutes new and material evidence warranting a remand of this case. ECF Dkt. #17 at 14. The evaluation indicates that Plaintiff was concerned about Claimant's language development because she appeared to put only two or three words together at a time and appeared to be developmentally delayed. Tr. at 55. Plaintiff reported that Claimant's three year-old sister had a speech delay and her thirteen year-old brother had ADHD and a cognitive delay. *Id.*

The speech language pathologist ("SLP") indicated she conducted a Receptive-Expressive Emergent Language Test, Third Edition ("REEL-3"), which was based on her observation and Plaintiff's reports about Claimant. Tr. at 55. The SLP observed that Claimant followed one-step directions when asked, but would not follow directions to move her mouth and face for an oral mechanism examination. *Id.* The SLP noted that much of what Claimant said was difficult to understand. *Id.* Based upon her observation and Plaintiff's report, the SLP found that Claimant's auditory comprehension was moderately impaired and her verbal expression was moderately impaired as well. *Id.* She opined that Claimant's age equivalent in receptive language was 15 months and her expressive language was 21 months. *Id.* The SLP rated Claimant's overall language ability as poor. *Id.*

The SLP recommended that Claimant receive individual or group speech-language therapy one or two times per week for 30-90 minutes per session for a minimum of 6 months. Tr. at 56. It was also recommended that the SLP perform an oral motor examination when Claimant was comfortable enough to comply with given directions. *Id.* She opined that Claimant's prognosis was good with consistent intervention and home follow-through. *Id.*

-23-

The Sixth Circuit holds that "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016), quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir.2001).  However, such evidence can be considered if a claimant can show that the new evidence "is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  *Id.*, quoting 42 U.S.C. § 405(b) and citing *Foster*, 279 F.3d at 357.  In order to satisfy the materiality component, a claimant must show that "there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)(citations omitted)).  Evidence that demonstrates an aggravation or deterioration of a condition "is not relevant because it does not show the point in time that the disability itself began."  *Id.*

Here, the evidence is new in that it was not presented to the ALJ because it post-dated the ALJ's decision.  However, the Appeals Council considered the speech language evaluation and found that it did not relate to the period at issue in the ALJ's decision and thus did not impact the ALJ's decision about whether Claimant was disabled from her date of birth through August 17, 2016 as the evaluation was dated November 2, 2016.  Tr. at 2, 55-56.  Respondent asserts in her brief on the merits that while the evaluation may be new evidence, it is not material because it does not impact whether Claimant had medically determinable impairments from her date of birth through August 17, 2016.  ECF Dkt. #18 at 11.  Respondent further contends that the evaluation also fails to establish that the moderately impaired language skills would last longer than the 12-month durational requirement that Step Two also requires.

The undersigned recommends that the Court find that the November 2, 2016 SLP evaluation is new evidence, but it is not material because, as the Appeals Council found, it fails to establish that Claimant had a severe medically determinable speech impairment between January 11, 2014 through August 17, 2016, the date of the ALJ's decision.  Tr. at 1-3.  While there is post-hearing medical evidence which showed an assessment of a speech delay on January 26, 2016, there was insufficient evidence to establish that this was a severe medically

-24-

determinable impairment because, as the ALJ found, the November 13, 2015 Help Me Grow program showed that Claimant was not eligible for early intervention as she demonstrated skills similar to children her same age.  *Id.* at 256.  Further, the ALJ noted that no speech therapy was pursued after the January 26, 2016 assessment and neurologic examinations showed normal growth and development.  *Id.* at 14.  As the Sixth Circuit in *Sizemore* noted regarding a condition that has been aggravated or deteriorated, "the appropriate remedy is to initiate a new claim for benefits as of the date that the condition aggravated to the point of constituting a disabling impairment.  865 F.3d at 712, citing *Oliver v. Sec'y of Health & Human Servs*., 804 F.2d 964, 966 (6th Cir.1986) and *Ward v. Schweiker*, 686 F.2d 762, 764–65 (9th Cir.1982).

## VIII.  CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ, finding that the November 2, 2016 speech evaluation is not material evidence to warrant a remand and that substantial evidence supports his decision, and, therefore, the undersigned also recommends that the instant case be dismissed in its entirety with prejudice.

Date: June 22, 2018                          */s/George J. Limbert*
                                             GEORGE J. LIMBERT
                                             UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).